**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

EMORY ANTHONY KINSEY,

             Plaintiff,

vs.                                         Case No.  3:01-cv-785-J-32MCR

CITY OF JACKSONVILLE,

             Defendant.

_____/

# O R D E R

**THIS CAUSE** is before the Court on Defendant's Amended Motion for Summary

Judgment (Doc. 89) filed June 14, 2005.  Plaintiff, proceeding *pro se*, responded to this

motion on June 29, 2005.  (Doc. 90).[1]

## I. PROCEDURAL HISTORY

Plaintiff, Emory Anthony Kinsey, is a former employee of the Defendant, the City

of Jacksonville.  Plaintiff filed the Complaint in this case *pro se* on July 12, 2001,

alleging various violations of the Americans with Disabilities Act (the "ADA"), 42 U.S.C.

§12101 et seq.  (Doc. 1).  Plaintiff had a very difficult time properly effectuating service

_____

[1] Additionally, on July 13, 2005, Plaintiff filed a Motion to Amend his response to the summary judgment motion.  (Doc. 91).  The Court has considered the information in this motion but does not believe it is necessary to amend Plaintiff's original response. Accordingly, that motion is denied.

upon the City.  Indeed, it was not until July 14, 2003, over two years after the Complaint was filed, that Plaintiff properly served the Summons upon the City.[2]  (Doc. 46).

On August 4, 2003, the City filed a motion to dismiss asking the Court to dismiss the Complaint for untimely service and because it failed to state a claim upon which relief could be granted.  (Doc. 48).  The Court declined to dismiss the Complaint on service grounds, but did dismiss it without prejudice on substantive grounds.  (Doc. 53).  In its Order, the Court provided Plaintiff with guidance regarding how to re-file his complaint.  Specifically, the Court informed Plaintiff that the complaint failed to allege his impairment substantially limited any major life activity or that the City regarded him as having an impairment which substantially limited a major life activity.  (Doc. 53, pp. 9-10).  Additionally, the Court informed Plaintiff his retaliation claim was deficient and explained the elements of a retaliation claim.  (Doc. 53, p.10).

On November 28, 2003, Plaintiff filed his Fifth Amended Complaint.  (Doc. 54).  Shortly thereafter, Plaintiff filed a motion seeking leave to file a sixth amended complaint.  (Doc. 56).  The Court granted the motion and on December 30, 3003, Plaintiff's Sixth Amended Complaint was filed.  (Doc. 62).  The Sixth Amended Complaint alleged claims for disability discrimination, retaliation and hostile work environment harassment under the ADA as well as violations of the Family and Medical Leave Act (the "FMLA"), 29 U.S.C. §2601-2654.  (Doc. 62).

---

[2]  For a period of time after filing his Complaint, Plaintiff was represented by counsel.  Plaintiff's attorney sought several extensions of time to perfect service.  Eventually, on March 26, 2003, Plaintiff's counsel withdrew because he was moving out of state.  (Doc. 32).  Plaintiff has not obtained replacement counsel.

On January 5, 2004, Defendant filed another motion to dismiss again asking the Court to dismiss the Sixth Amended Complaint because service was not timely accomplished and because it failed to state a claim upon which relief could be granted. (Doc. 63).  Specifically, the City claimed Plaintiff had not pled facts showing he was "disabled" as that term is defined in the ADA because Plaintiff again failed to allege he was substantially limited in any major life activity.  (Doc. 63, pp. 6-9).  Additionally, the City asserted Plaintiff's retaliation claim under the ADA failed because the retaliation alleged by Plaintiff, letters and reprimands, did not amount to "adverse employment actions" sufficient to show retaliation.  (Doc. 63, p.10).  This time, the Court found that Plaintiff had again failed to allege his impairment substantially limited a major life activity and therefore, dismissed Plaintiff's failure to accommodate and hostile work environment claims under the ADA with prejudice.  (Doc. 65).  The Court also dismissed Plaintiff's FMLA claims with prejudice but allowed Plaintiff's retaliation claim to remain. (Doc. 65).

On April 1, 2004, Plaintiff filed a Seventh Amended Complaint (Doc. 66) alleging retaliation.  Defendant filed an answer on April 15, 2004 (Doc. 67).  The parties then engaged in discovery and at the conclusion of discovery, Defendant filed the instant motion for summary judgment on Plaintiff's retaliation claim.

## II. FACTUAL BACKGROUND[3]

Plaintiff began his employment with the City of Jacksonville as a temporary public works helper on January 3, 1995.  (Pl. Dep. 28:17-22).  Plaintiff became a permanent employee the next year.  (Pl. Dep. 28-29).  Plaintiff testified that public works employees were responsible for various tasks such as laying sandbags, laying sod, digging, operating saws and weed-eaters.  (Pl. Dep. 48).  Plaintiff was first diagnosed with hypertension in 1988 (Pl. Dep. 18).  Plaintiff was taking three different medications for his hypertension.  (Pl. Dep. 18-19).  According to Plaintiff, he first sought accommodation from the City in July 2000.  (Pl. Dep. 30).  In response to his request for accommodation, the City required Plaintiff to complete a medication disclosure form and have it signed by his doctor.  On August 2, 2000, Plaintiff was sent home and told that in order to return to work, he would need a full release from his doctor and would be required to submit to a fitness for duty examination.  (Pl. Dep. 55-59).  Also on August 2, 2000, Plaintiff filed a charge of discrimination with Jim Greene in the City's Equal Opportunity/Equal Access office.  (Pl. Dep. 104-05).  On August 22, 2000, Plaintiff saw Dr. Terry W. Kuhlwein, the City's Medical Review Officer ("MRO"), for a fitness for duty examination.  Dr. Kuhlwein recommended that Plaintiff "limit his exposure to sun and heat equal to or above 80 degrees F. to 15-minutes at a time intermittently."[4]  (Doc. 90,

---

[3] Consistent with summary judgment practice, the facts stated are either undisputed or are stated in a light most favorable to Plaintiff.  See White v. Mercury Marine, Div. of Brunswick, Inc., 129 F.3d 1428, 1430 (11th Cir. 1997).

[4] Attached as Exhibit A to Plaintiff's Response are numerous documents.  They do not have bates stamps or any other identification.  Accordingly, the Court will cite to them

(continued...)

Ex. A).  Plaintiff was placed on FMLA leave at this time and remained on leave until

October 2000.  On October 19, 2000, Plaintiff sent a letter to the City stating that he

planned to return to work at the end of his FMLA leave, October 25, 2000.  (Doc. 90, Ex.

A).  On October 25, 2000, the City sent a letter to Plaintiff confirming that he was

permitted to return to work on October 25, 2000 because "the average daily

temperature should be at or below 80 degrees Fahrenheit for the next several months."

(Doc. 90, Ex. A).  The letter further stated:

> The medical record reflects that you should <u>have no problem
> returning to full duty as a Public Works Worker</u> as long as
> the temperature stays at or below 80 degrees Fahrenheit.
> Please note that you must work with Dr. Casey for additional
> evaluation and possible management of your persistently
> elevated blood pressure.  If you fail to correct your
> antihypertensive medications / extreme heat condition prior
> to temperatures reaching 80 degrees Fahrenheit you may
> again be forced to used [sic] sick leave or request leave of
> absence due to your illness.

(Doc. 90, Ex. A).

Plaintiff returned to work without incident until May 22, 2001, when Plaintiff

passed out while rolling some canvas.  Plaintiff went to the hospital and was diagnosed

with heat exhaustion.  Plaintiff was discharged on May 23, 2001 with instructions not to

work May 23 or 24, 2001, to force fluids, to stay out of the heat and to avoid

antihistamines.  (Doc. 90, Ex. A).  On June 8, 2001, the City sent Plaintiff a letter

notifying him that his upcoming absence qualified for FMLA leave and on June 28,

---

[4](...continued)
as (Doc. 90, Ex. A).

2001, Plaintiff was seen by Dr. Kuhlwein for another fitness for duty examination.  (Doc.

90, Ex. A).  Dr. Kuhlwein opined that Plaintiff:

> continues to suffer with hypertension requiring three
> medications.  These medications may predispose him to
> heat related side effects, which would include dehydration
> and heat exhaustion type symptoms.  He is fit for duty with
> accommodation in that he should limit his exposure to sun to
> brief periods and to avoid temperatures above 80 degrees F.
> This is a permanent restriction since he will continue to need
> to be treated for his blood pressure.  I have previously
> recommended that he discuss with Dr. Casey the possibility
> of trying another type of medication, however, it is likely that
> he will continue to require three medications from three
> different classes of antihypertensives, and is likely to
> continue to experience heat related side effects regardless
> of the exact medication that he is taking.  I would
> recommend that he only work in a climate controlled
> environment, with only brief exposures to the sun and heat
> greater than 80 degrees F.  In my opinion, his hypertension,
> medications for hypertension, and heat related side effects
> of medications for hypertension, do not qualify under the
> Americans with Disabilities Act.

(Doc. 90, Ex. A).  The documents attached to Plaintiff's response contain numerous

emails from City employees regarding accommodating Plaintiff.  (Doc. 90, Ex. A).  On

July 10, 2001, Bill Marshall, the Manager of Personnel Services, sent an email to other

City officials relaying Dr. Kuhlwein's findings and noting that although Plaintiff was not

covered by the ADA, the City had a history of utilizing individuals with medical

conditions to the best of their ability.  (Doc. 90, Ex. A).  Mr. Marshall suggested

accommodating Plaintiff in his current position or moving him to a position which would

allow him to be productive year round.  (Doc. 90, Ex. A).  Marlene Wright, the Assistant

Management Improvement Officer, responded that she did not believe Plaintiff could be

accommodated in his current position or in any other position unless he had clerical

skills (i.e. typing and computer experience).  (Doc. 90, Ex. A).  Mr. Marshall responded

that if Plaintiff could not be accommodated in his current position, the City should look

for other jobs within Public Works.  If there were no positions in Public Works, they

should then look citywide.  (Doc. 90, Ex. A).

On September 7, 2001, Denise Ostertag, Manager of Personnel Services, sent a

letter to Plaintiff informing him of a job opportunity as a Police Emergency

Communication Offer and notifying Plaintiff that in order to be eligible for the position,

Plaintiff would need to receive a passing score on both the written and performance

examinations.  (Doc. 90, Ex. A).  Plaintiff did not pass the written examination.

On August 2, 2001, Plaintiff sent a letter to the City stating that he planned to

return to work August 8, 2001.  (Doc. 90, Ex. A).  The City sent a responsive letter on

August 3, 2001, informing Plaintiff that he could not return to work until he received a full

medical release from his personal physician.  (Doc. 90, Ex. A).  On August 24, 2001,

Plaintiff sent a second letter stating that he would return to work on August 31, 2001

(which would be the conclusion of his 12-week FMLA leave).  Again the City responded

by notifying Plaintiff that he could not return to work without a full medical release from

his doctor.  (Doc. 90, Ex. A).  The record is not clear as to the date Plaintiff returned to

work.  In October 2001, Plaintiff sent a letter to the City requesting a transfer to a

climate controlled position with the City.  (Doc. 90, Ex. A).

It appears that on February 14, 2002, the City sent Plaintiff a letter reminding him

that in the past two years, he had been medically unable to work as a Public Works

worker when the temperature rose above 80 degrees Fahrenheit.[5]  (Doc. 90, Ex. A).

The letter encouraged Plaintiff to revive his efforts at securing other employment within

the City that would allow him to work in a climate controlled environment.  The letter

also informed Plaintiff that although he may qualify for FMLA leave if he worked enough

hours to be entitled to such leave, he would not be granted a leave of absence under

the City's leave policy.  Therefore, the letter informed Plaintiff that once Plaintiff had

used the twelve weeks of FMLA leave, he could "be separated from employment under

the Civil Service rules for [his] inability to perform the duties of [his] position."  (Doc. 90,

Ex. A).

On February 5, 2002, Plaintiff received an oral reprimand for taking seven hours

of unauthorized leave on January 29, 2002.  The oral reprimand form states: "Employee

was advised that an Oral Reprimand is considered discipline, but that failure to heed

reprimand will result in future disciplinary action."  (Doc. 90, Ex. A).

Plaintiff and his attorney met with various City representatives on March 15,

2002.  During the meeting, they discussed attempting to locate an alternative position

for Plaintiff but notified Plaintiff that there was a citywide hiring freeze in effect.  (Pl. Dep.

153).  Plaintiff admits that during this meeting, Denise Ostertag arranged for him to

attend a one-day computer course and to take the examination for the Police

Communication Officer position.  (Doc. 90, Ex. B).

On July 31, 2002, Plaintiff was involved in an accident while at work.  The police

report indicates that Plaintiff was backing a dump truck up a hill to dump a load of dirt.

---

[5]  The letter attached to Plaintiff's Response is not signed.

Plaintiff backed close to the edge of the hill and the dirt gave way causing the truck to overturn.  (Doc. 90, Ex. A).  Plaintiff was not injured and was issued a warning citation. During his deposition, Plaintiff testified that he blacked out while in the truck and that is how he overturned the vehicle.  (Pl. Dep. 26, 62).  On September 4, 2002, Plaintiff received an oral reprimand for this accident.  This form stated "Employee was advised that an Oral Counseling is not considered discipline, but that failure to heed counseling will result in discipline."  (Doc. 90, Ex. A).

On September 3, 2002, Plaintiff was admitted to Shands Jacksonville for treatment for syncope.  Plaintiff was discharged on September 6, 2002.  (Doc. 90, Ex. A).  It appears Plaintiff returned to work as the record reflects emails noting that on September 12, 2002, Plaintiff asked his Area Superintendent for an accommodation to work out of the heat as the temperature was over 80 degrees Fahrenheit.  (Doc. 90, Ex. A).  Plaintiff was sent home.  Also on September 12, 2002, Plaintiff filled out a Complaint Questionnaire to the City's EEO office claiming to have been subjected to harassment, intimidation, retaliation, working under a hostile environment and a refusal to accommodate his condition.  (Doc. 90, Ex. A).

Plaintiff states that he met with Rebecca Salter, who succeeded Ms. Ostertag as Manager of Personnel Services, on September 30, 2002 to discuss his skills and abilities.  On October 3, 2002, Ms. Salter sent a letter to Plaintiff scheduling a weekly time to meet with him to discuss potential positions. (Doc. 89, Ex. C, Attachment 1). According to Plaintiff, he met with Ms. Salter again on October 11, 2002 and asked her how long it might take to find him a job.  (Pl. Dep. 33).  Ms. Salter told him that it could

take anywhere from four to eight months to find a new position.  Id.  On October 14,

2002, Ms. Salter sent Plaintiff a follow-up letter in which she noted that one position had

been identified for which Plaintiff could be qualified.  (Doc. 89, Ex. C, Attachment 3).

Ms. Salter was attempting to learn whether the available position, Program Aide,

required driving as Plaintiff indicated he was no longer able to drive.  Id.  Plaintiff claims

hearing that it could take as long as eight months to find him a job caused him great

stress and he felt compelled to resign.  (Pl. Dep. 33).  Accordingly, on October 16, 2002,

Plaintiff sent the City a letter notifying them that he was resigning "because of medical

and emotional reasons."  (Doc. 89, Ex. C, Attachment 4).[6]

### III.  DISCUSSION

**A.  Standard of Review for Motions for Summary Judgment**

Summary judgment is appropriate if the "pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact."  Fed.R.Civ.P. 56(c).  Factual issues

are "genuine" when there is a real basis in the record.  See Matsushita Elec. Indus. Co.,

Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986).  The

burden is on the moving party, and is satisfied if there is no evidence in the record to

support an essential element of the non-moving party's case.  See Celotex Corp. v.

Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554 (1986).

---

[6]  Additionally, in the letter, Plaintiff thanked the City for the "opportunity and privilege" to work there and acknowledging that while there had been some bad time, there had also been some good times.  (Doc. 89, Ex. C, Attachment 4).

Any evidence presented must be evaluated in the light most favorable to the non-moving party.  See White, 129 F.3d at 1430 (internal citations omitted).  Additionally, all reasonable inferences will be drawn in favor of the non-moving party, however, the inferences must be plausible.  See Griesel v. Hamlin, 963 F.2d 338, 341 (11th Cir. 1992); Mize v. Jefferson City Bd. Of Educ., 93 F.3d 739, 743 (11th Cir. 1996).

If a reasonable juror could infer from the evidence presented the conclusions upon which the non-moving party depends, the motion for summary judgment should be denied.  Alphin v. Sears, Roebuck & Co., 940 F.2d 1497, 1500 (11th Cir. 1991).

**B.  Plaintiff's Claim of Retaliation**

ADA retaliation claims are analyzed under the same framework employed for retaliation claims under Title VII.  Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1287 (11th Cir. 1997).  Thus, a plaintiff claiming retaliation under the ADA has the burden of showing that the fact he engaged in protected activity was a determining factor in the employment actions about which he complains.  Walker v. NationsBank of Florida N.A., 53 F.3d 1548, 1555 (11th Cir. 1995).  The plaintiff may do this in one of three ways: either through direct evidence of discriminatory intent; statistical evidence; or the test set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817 (1973), which allows a plaintiff to present circumstantial evidence to raise a rebuttable presumption of intentional discrimination.  Walker, 53 F.3d at 1556 (citing, Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir. 1989)).  In this case, Plaintiff has presented neither statistical evidence nor direct evidence of retaliation and, therefore, the Court will proceed using the McDonnell Douglas framework.

-11-

Under the McDonnell Douglas framework, a three-part test is utilized. First, the plaintiff must establish a *prima facie* case of retaliation. Combs v. Plantation Patterns, 106 F.3d 1519, 1527-28 (11th Cir. 1997). Once the plaintiff has established a *prima facie* case, a rebuttable presumption of retaliation is created and the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for its actions. See Combs, 106 F.3d at 1528 (citing, Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094 (1981)). "[T]o satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." Combs, 106 F.3d at 1528 (quoting, Burdine, 450 U.S. at 257, 101 S.Ct. at 1096).

Finally, if the employer produces one or more legitimate, non-discriminatory reasons, the presumption of discrimination is eliminated and again, the burden rests upon the plaintiff. This time, the plaintiff must show the employer's reasons are a pretext for unlawful discrimination. E.E.O.C. v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1273 (11th Cir. 2002) (citing, Burdine, 450 U.S. at 255-56, 101 S.Ct. at 1095-96). Notwithstanding the foregoing shifting burdens analysis, the general overriding principle remains that the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Burdine, 450 U.S. at 253, 101 S.Ct. at 1093.

In its Motion for Summary Judgment, Defendant argues Plaintiff's retaliation claim must fail because Plaintiff cannot state a *prima facie* case of retaliation.

Additionally, Defendant argues that even if Plaintiff is able to make a *prima facie* showing, he cannot show the City's reasons for its conduct is merely a pretext for unlawful retaliation.

### 1. The *prima facie* case

In order to make a *prima facie* showing of retaliation under the ADA, a plaintiff must allege facts showing: (1) he engaged in conduct protected by the ADA, (2) he suffered an adverse employment action "at the time, or after the protected conduct took place," and (3) the defendant "took an adverse employment action against [him] because of [his] protected conduct." Collado v. United Parcel Service, Co., 419 F.3d 1143, 1158 (11th Cir. 2005) (quoting, 3C Fed. Jury Prac. & Instr. § 172.24 (5th ed.)). Plaintiff claims he complained about alleged discrimination at least four times while employed with the City and this satisfies the first element of his *prima facie* case. Specifically, Plaintiff filed complaints with the City on August 2, 2000 and September 12, 2002 and filed two charges of discrimination with the FHRC on October 31, 2000 and September 8, 2001.[7]  The City does not dispute that Plaintiff satisfies the first element of the *prima facie* case.

With respect to the second element, it is difficult to discern the alleged adverse employment actions Plaintiff claims.  In his Response to the Motion for Summary

---

[7] In its Motion for Summary Judgment, the City claims although Plaintiff alleges to have filed charges with the FCHR on October 31, 2000 and September 8, 2001, "the record indicates  that Mr. Kinsey filed complaints with the FCHR and that such complaints were dated January 26, 2001 and March 23, 2002." (Doc. 89, p.4, n.3).  However, the City did not attach copies of these complaints and the Court cannot locate them anywhere in the record.  Accordingly, the Court will accept the dates alleged by Plaintiff for the filing of his complaints.

Judgment, Plaintiff states that the adverse employment actions were (1) being forced to sign documents he did not want to, (2) being denied an accommodation, and (3) being forced to leave work and have no income from August 30, 2000 until October 25, 2000. (Doc. 90, pp. 7-8).  In his deposition, Plaintiff provides additional examples of adverse employment actions.  Plaintiff claims that (1) he was sent retaliatory letters from the City (Pl. Dep. 125-26, 138), (2) he was required to operate trucks despite being on medication (Pl. Dep. 140) and (3) he was forced to resign (Pl. Dep. 155-56).

The Eleventh Circuit has determined that for an action to be considered an adverse employment action, it "must either be an ultimate employment decision or else must 'meet some threshold level of substantiality.'"  Stavropoulos v. Firestone, 361 F.3d 610, 616-17 (11th Cir. 2004), cert. denied, --- U.S. ----, 125 S.Ct. 1850 (2005) (quoting, Bass v. Board of County Com'rs, Orange County, Fla., 256 F.3d 1095, 1118 (11th Cir. 2001)) .  "Ultimate employment decisions include decisions such as termination, failure to hire, or demotion."  Id. at 617 (citing, Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1456 (11th Cir. 1998)).  In Gupta v. Florida Bd. of Regents, 212 F.3d 571 (11th Cir. 2000), the Eleventh Circuit characterized the threshold for substantiality as requiring the employment action to be "'objectively serious and tangible enough' to alter [the employee's] 'compensation, terms, conditions, or privileges of employment . . .'"  Id. at 588 (quoting, Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3rd Cir. 1997).  The Court finds that four of the six alleged retaliatory acts do not constitute adverse employment actions.

First, Plaintiff claims he was retaliated against by being forced to sign letters he did not want to.  These letters include an FMLA leave request form, a medication disclosure form and two oral reprimands.  (Doc. 90, p.9).  Clearly, signing these letters was not an ultimate employment decision and therefore, the Court must determine whether they meet the level of substantiality.  In the instant case, the FMLA leave request form and the medication disclosure form did not alter Plaintiff's compensation, terms, conditions or privileges of employment.  As such, requiring Plaintiff to sign the forms was not an adverse employment action.  The same is true for the oral reprimand forms.  The forms explicitly note that Plaintiff was signing the form to acknowledge receipt of the form only.  Accordingly, Plaintiff's signature does not imply his agreement with the reprimand and his being required to sign the form is not an adverse employment action.

Plaintiff also claims that he was denied a reasonable accommodation in retaliation for complaining about alleged discrimination.  The Court finds this argument simply an attempt to re-argue his failure to accommodate claim, which the Court dismissed with prejudice in its March 10, 2004 Order (Doc. 65).  See Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1261 (11th Cir. 2001) (affirming summary judgment of ADA retaliation claim based on failure to accommodate).

Next, Plaintiff alleges he received retaliatory letters.  Specifically, Plaintiff points to the October 25, 2000 letter permitting Plaintiff to return to work but noting that if Plaintiff did not correct his "antihypertensive medications / extreme heat condition prior to temperatures reaching 80 degrees Fahrenheit [he] may be forced to use[] sick leave

or request leave of absence due to [his] illness."  (Doc. 90, Ex. A).  Additionally, Plaintiff

claims the February 14, 2002 letter containing the same warning is also retaliatory.  The

February 14, 2002 letter also notifies Plaintiff that if he has not worked enough hours to

qualify for FMLA leave, the City would not be granting him a leave of absence under its

leave policy and Plaintiff may be "separated from employment under the Civil Service

rules for [Plaintiff's] inability to perform the duties of [his] position."  (Doc. 90, Ex. A).

Even if these letters are deemed threats, they do not constitute adverse employment

actions.  See  Mistretta v. Volusia County Dept. of Corrections, 61 F.Supp.2d 1255,

1260 (M.D. Fla. 1999) (holding plaintiff's retaliation claim fails because "verbal

reprimands and threats of termination do not constitute adverse employment actions").

        Finally, Plaintiff claims he was forced to operate trucks despite being on

medication, which should have precluded such work.  To support this claim, Plaintiff has

attached portions of what appears to be a DOT regulation stating that an employer may

not allow an employee to perform safety-sensitive functions while on controlled

substances except when "used pursuant to a physician's instructions and the physician

has advised the employee the substance does not adversely affect the employee's

ability to safely operate a commercial motor vehicle."  (Doc. 90, Ex. A).  However,

Plaintiff fails to acknowledge that both his personal physician and the City's MRO, who

were both fully aware of Plaintiff's medications, released him to work so long as the

temperature was not above 80 degrees Fahrenheit.  Plaintiff has not alleged or

presented any evidence showing that the City believed his medications adversely

affected his ability to operate a truck in the absence of temperatures in excess of 80

degrees.  As such, the Court does not believe requiring Plaintiff to drive a truck while on medication is an adverse employment action.

As for Plaintiff's remaining claims, the Court finds Plaintiff's allegation that he was forced to take FMLA leave without pay in retaliation for complaining about discrimination sufficient.  Requiring an employee to take leave without pay could be considered an adverse employment action as it directly affects the employee's compensation.  Knight v. Computer Sciences Raytheon, 2002 WL 32818520 (M.D. Fla. 2002) (noting that "being placed on unpaid suspension and unpaid medical leave can be considered adverse employment actions").

Finally, Plaintiff claims he was forced to resign  in retaliation for complaining about discrimination.  To prove a constructive discharge, "a plaintiff must demonstrate that working conditions were 'so intolerable that a reasonable person in his position would have been compelled to resign.'"  Poole v. Country Club of Columbus, Inc., 129 F.3d 551, 553 (11th Cir. 1997) (quoting Thomas v. Dillard Dept. Stores, Inc., 116 F.3d 1432, 1433-34 (11th Cir. 1997)).  The City argues that Plaintiff cannot show constructive discharge because the City was working with him to locate alternative positions. Indeed, the City claims it offered Plaintiff a Canning Center Worker position, which Plaintiff turned down.  Plaintiff denies that he turned down any position and claims that he felt compelled to resign after he learned that it might take as long as eight months to find him an alternative position. (Pl. Dep. 33).  Additionally, Plaintiff states he was compelled to resign out of concern for his health and safety because the City would not accommodate him.  (Plaintiff's Seventh Amended Complaint, Doc. 66, ¶14).

Although Plaintiff admits the City was in the process of assisting him in locating an appropriate position, Plaintiff testified that he needed the money and the thought of having to wait an additional eight months without pay to find a suitable position was inconceivable.  Additionally, Plaintiff referenced the February 14, 2002 letter which indicated that Plaintiff's employment could be terminated if he did not find an alternative position.  The Court believes genuine issues of material fact remain as to whether a reasonable person in Plaintiff's position would have found the conditions so intolerable so as to feel compelled to resign.  Accordingly, Plaintiff's constructive discharge is sufficient to constitute an adverse employment action for summary judgment purposes.

Having found Plaintiff established two adverse employment actions, the Court now turns to the third element of the *prima facie* case, which requires Plaintiff to show that the adverse employment actions were causally related to his protected conduct.  To establish a causal connection, a plaintiff must show that "'the decision-maker[s] [were] aware of the protected conduct,' and 'that the protected activity and the adverse action were not wholly unrelated.'"  Gupta, 212 F.3d at 590 (quoting Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1337 (11th Cir. 1999)).  Additionally, the Eleventh Circuit has determined that for purposes of a *prima facie* case, "'close temporal proximity' may be sufficient to show that the protected activity and the adverse action were not 'wholly unrelated.'"  Id.

The City does not claim that it was unaware of Plaintiff's complaints of discrimination.  Instead, the City argues Plaintiff cannot make the causal connection showing because his charges were dated August 2, 2000 and March 23, 2002 and

Plaintiff resigned October 16, 2002 and therefore, too much time passed for there to be a causal connection. (Doc. 89, p.19). However, as the Court noted previously, it accepts Plaintiff's claim that he filed complaints of discrimination on August 2, 2000, October 31, 2000, September 8, 2001 and September 12, 2002. Plaintiff took leave without pay in the summers of 2001 and 2002 and resigned October 16, 2002. Accordingly, the undersigned finds a sufficiently close temporal proximity between Plaintiff's complaints of discrimination and the adverse employment actions to find that they are not wholly unrelated. As such, Plaintiff has established a *prima facie* case of retaliation with respect to being required to take unpaid leave and being constructively discharged.

**2.    The City's Legitimate Non-Retaliatory Reasons**

Because Plaintiff has established a *prima facie* case of retaliation, a presumption of retaliation is created. However, Defendant has rebutted this presumption by articulating legitimate, non-retaliatory reasons for placing Plaintiff on unpaid FMLA leave and its inability to place Plaintiff in an alternative position (which is what Plaintiff alleged caused him to resign). The City argues that based on his heat-related condition, Plaintiff was not able to perform his job and that Plaintiff's condition was not covered by the ADA. Accordingly, every time the temperature exceeded 80 degrees Fahrenheit, Plaintiff was unable to work and if he had exhausted his paid leave, the City put him on unpaid FMLA leave. Additionally, the City claims it was working with Plaintiff to find an alternative position, however, he failed the examination for one position and resigned shortly after a second position was identified. The Court believes these explanations

satisfy the City's burden for articulating legitimate, non-retaliatory reasons for its actions.

See Meeks v. Computer Associates Intern., 15 F.3d 1013, 1019 (11th Cir. 1994)

(defendant's burden to show legitimate, non-discriminatory reason is "exceedingly

light").  Accordingly, the burden is now placed on Plaintiff to show that the reasons

articulated by Defendant were not the true reasons for its conduct, but were merely

pretext for unlawful retaliation.

### 3.    Pretext

A plaintiff may show pretext either directly "by persuading this Court that a

discriminatory reason more likely motivated [the defendant], or indirectly by showing

that [the defendant's] proffered explanation is unworthy of credence."  St. Hilaire v. The

Pep Boys, 73 F.Supp.2d 1350, 1360 (S.D. Fla. 1999).  In the present case, Plaintiff has

done neither.  Plaintiff presents absolutely no evidence that his complaints of

discrimination played any part in the decision to place him on unpaid medical leave or in

the City's failure to find him an alternative position.

In his response to the Motion for Summary Judgment, Plaintiff simply claims that

he will show the pretextual nature of the City's conduct at trial.  (Doc. 90, p.8).  Plaintiff

also claims that the City's explanation that they could not find a position for Plaintiff for

which he was qualified is pretext because the City could have put him in any position.

(Pl. Dep. 113).  The City explains that it had no open positions in Supply (which is where

Plaintiff wanted to be placed) and Plaintiff admits he was not aware of any such open

positions.  (Pl. Dep. 74-74, 113).  Accordingly, the City undertook a search for other

available positions.  Plaintiff admits the City arranged for him to take an examination for

the Police Emergency Communications Officer position but that he did not receive a passing score on the written portion of the examination.  (Doc. 90, p.9).  Additionally, Plaintiff admits the City arranged for him to take a computer course.  (Doc. 90, Ex. B). Additionally, Plaintiff does not dispute the letters from Ms. Salter showing that she planned to meet with Plaintiff on a weekly basis in order to assist him to find an alternative position.  (Doc. 89, Ex. C, Attachments 1 and 3).  All of this conduct is inconsistent with an employer seeking to force an employee to resign.  Plaintiff has pointed to no available positions he should have been placed into.  Rather, he proclaims that the City could have put him in any position.  This is not sufficient to show pretext.

Additionally, Plaintiff has presented no evidence showing that the City's explanation for placing him on unpaid leave was pretextual.  The City explains that both the City's MRO and Plaintiff's own physician stated that Plaintiff could not work outside in temperatures exceeding 80 degrees Fahrenheit.  Plaintiff does not even attempt to dispute this.  Instead, he claims the City should have accommodated him and placed him in another position.  As stated above, the City provided a legitimate, non-retaliatory explanation for its failure to place Plaintiff in an alternative position.  As such, the Court finds as a matter of law that Plaintiff has failed to establish pretext and thus, summary judgment is due to be granted in favor of Defendant.

**IV.  CONCLUSION**

For the foregoing reasons the Court finds summary judgment is appropriate on

Plaintiff's ADA retaliation claim.  Accordingly, after due consideration, it is

**ORDERED**:

1.      Plaintiff's Motion to Amend Response to Summary Judgment (Doc. 91) is

**DENIED**.

2.      Defendant's Amended Motion for Summary Judgment (Doc. 89) is

**GRANTED**.  The Clerk shall enter Judgment in favor of Defendant, the City of

Jacksonville, and against Plaintiff, Emory A. Kinsey.

3.      The Clerk shall close the file.

**DONE AND ORDERED** in Chambers in Jacksonville, Florida this 6th day of

December, 2005.

TIMOTHY J. CORRIGAN
United States District Judge


Copies to:

Emory Anthony Kinsey, *pro se* plaintiff

Counsel of Record